UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| v. | : | No. 3:11CR10(EBB) |
| DAMONT GEE | : | |

RULING ON MOTION TO SUPPRESS

On March 8, 2011, a grand jury returned a ten-count indictment against the defendant, Damont Gee ("Gee"), and six other individuals charging them with various narcotics and firearms offenses. Gee was charged in count one with conspiracy to distribute and to possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846, 841(a)1) and 841(b)(1)(A)(ii).

The indictment was the result of a long-term Organized Crime & Drug Enforcement Task Force ("OCDEFT") investigation of a drug trafficking organization known as the Marina Village Bloods ("MVB"), which operated in Bridgeport, Connecticut. As part of the investigation, the government received authority to intercept communications occurring over five cellular telephones,[1] two of which were used by Gee. Gee moved to suppress the communications that were intercepted over his two cellular phones on the grounds that the affidavits submitted to obtain the wiretap authorizations did not satisfy the necessity requirements of 18 U.S.C. § 2518(3)(c). On May 31, 2013, the Court issued an order denying Gee's motion [doc. # 390]. This ruling sets forth the Court's reasons for denying suppression.

---

[1] Four wiretap authorizations were issued by U.S. District Judge Janet C. Hall. U.S. District Judge Warren W. Eginton authorized the interception of wire and electronic communications over one cellular telephone.

*Legal Standard*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq.* allows the government to intercept wire, oral and electronic communications in limited circumstances. Before such surveillance is allowed, the government must apply for a court order. The application for the court order must consist of a written affidavit, under oath, which sets forth a full and complete statement of the facts and circumstances justifying the belief that an order should be issued. The required facts and circumstances include details of the offense being or about to be committed and whether or not other investigative procedures have been tried and have failed or why they reasonably appear to be unlikely to succeed if tried or would be too dangerous. 18 U.S.C. § 2518(1)(b)&(c). As the Supreme Court has stated, the statutory requirements are "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). The "full and complete" statement of procedures that were attempted or considered prior to applying for a wiretap "serves both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasions of privacy." United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983). An affidavit offered in support of a wiretap warrant is adequate so long as it provides some basis for concluding, in a practical and commonsense fashion, that less intrusive investigative procedures are not feasible. Id. at 103 (quoting S. Rep. No. 90-1097, *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2129).

The law is clear, however, that the statute does not require the exhaustion of any particular investigative procedures before a wiretap may be authorized or that a wiretap be considered only as a last resort. This is so even where it appears that other techniques might bear fruit. United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987). "The purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted; . . . rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (quoting United States v. Vazsquez, 605 F.2d 1269, 1282 (2d Cir. 1979) (recognizing the inadequacy of obtaining evidence of the overall activities of a drug organization from confidential informants who played minor roles)); see also Young, 822 F.2d at 1237 (noting the inadequacy of physical surveillance which is likely to be conspicuous and draw attention to the investigation); United States v. Martino, 664 F.2d 860 (2d Cir. 1981) (finding that the use of pen registers and toll records were insufficient to identify the participants in phone conversations and other conspirators).

When reviewing a wiretap order, the Second Circuit grants considerable discretion to the authorizing judge's conclusion that the facts set forth in the application were "minimally adequate" to support the determination that was made. United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (quoting United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990)).

*Relevant Facts*

On October 25, 2010, U.S. District Judge Janet C. Hall ("Judge Hall"), authorized the interception of wire and electronic communications over cellular telephone 203-414-8374, which

was used by Gee ["Target Telephone 3"]. Interceptions began on October 26, 2010 and ended on approximately November 15, 2010. Again, on November 15, 2010, Judge Hall authorized the interception of wire and electronic communications over cellular telephone 203-260-8972, which was also used by Gee ["Target Telephone 4"]. Judge Hall authorized the continued interception of communications over Target Telephone 4 on December 10, 2010. Interceptions pursuant to that authorization began on December 10, 2010 and ended on January 4, 2011. In support of these wiretap orders, the government submitted affidavits from two FBI special agents who were involved in the investigation of Gee and other members of the MVB.

The affidavits supporting the applications set forth facts establishing probable cause and other details required by statute,[2] and averred broadly that "conventional procedures have been tried and have failed, appear reasonably unlikely to succeed if attempted or will be too dangerous to employ." The affidavits added that traditional investigative methods would continue to be utilized to obtain crucial information about the MVB's members and illegal activities, but asserted that court-ordered electronic surveillance would substantially complement those traditional methods, wiretaps were the only available investigative technique that could secure the evidence necessary to successfully prosecute the individuals who were engaged in the described offenses and to identify the organization's suppliers, the methods used to transport and deliver drugs to Gee and others, the locations where narcotics were stored and the identity of the assets that had been purchased with the proceeds from the drug trafficking.

---

[2]Gee does not claim that the wiretap applications violated the requirements of 18 U.S.C. 2518(4) or that the supporting affidavits did not establish probable cause. His only claim is that the affidavits violated the necessity requirements of Section 2518(3)(c).

The affidavits explained that, in the approximate twenty-two weeks since the investigation had begun, the government had obtained a great deal of information about the organization's members, methods and activities through the use of traditional investigative techniques including physical and video surveillance, undercover officers, confidential sources, including three confidential witnesses ["CW1" "CW2" "CW3"] and controlled purchases. These methods had enabled the government to (1) identify some of the organization's drug distribution activities and some of its members, (2) ascertain some of the locations where it sold drugs and a location where its members socialized, (3) make several controlled purchases and (4) identify one source of supply and obtain leads as to the identity of possible other sources. The affidavit further explained that previously authorized interceptions of calls over Target Telephones 1 and 2, along with physical surveillance, had enabled agents to learn the identity of one source of cocaine base; but they had other information that caused them to believe the organization had more than one source of supply of crack cocaine. More specifically, the agents revealed that Gee told CW-3 that one of his sources was a Dominican male from New Jersey known as "E." This lead, coupled with information previously learned through a pen register and Title III wiretaps in the District of New Jersey, led agents to believe that E was Jose Edua, a known trafficker in cocaine and heroin who was known to supply Gee's cousin, Nicole Tate, with narcotics. Gee also told CW-3 that "Shorty" was one of his suppliers, but provided no other details to enable the government to identify him.

But as the affidavit further explained, these traditional investigative methods were insufficient to reveal the full scope of the drug distribution conspiracy. In support of this contention, the affidavits set forth specific examples of how and why those methods were, and

5

would continue to be, inadequate.  For instance, they noted that physical surveillance of Gee had been of limited value because each time he had been surveilled he had been extremely surveillance conscious and employed counter-surveillance techniques, such as taking indirect routes, making unnecessary turns and alternating among three different vehicles.  In addition, the affidavits noted that Gee had recently moved his residence and the agents had been unable to learn his new address.  Further, they reported that physical surveillance had not been successful in disclosing the location where Gee and others packed and stashed the drug supplies and in identifying the source(s) of supply of heroin or the additional source(s) of crack cocaine.  In the October 25 affidavit, the government also explained how it had used an undercover officer on two separate occasions to make drug purchases from two different members of the conspiracy, but that on each occasion the suspects were extraordinarily wary of the undercover officer, so much so that they checked to insure he was not wearing a recording device.  The affidavit averred that, because the agents had learned in the course of their investigation that several members of the organization had access to and carried firearms, any further attempt to infiltrate the organization with an undercover officer would be too dangerous.

Further, the affidavits explained in detail how the use of confidential sources had been of limited benefit, specifically because none of the CWs were involved in the day-to-day operations of the organization, were in leadership positions or were privy to information such as where drugs and currency were stored, the identity and location of the suppliers, the means by which the proceeds of the transactions were used or hidden, or the full scope of the conspiracy.  To illustrate, the affidavits explained how CW-3, who had been able to obtain limited information from Gee, had not been able to engage Gee or his associates in discussions about specific details,

such as the identity of his suppliers, and that the agents believed it would arouse suspicion and probably endanger CW-3's safety if he were to ask Gee pointed questions.

The affidavits further explained that CW-1 and CW-2 were only able to purchase small quantities of drugs from only one location where street-level drug sales were made, but because Gee operated at a much higher level, neither CW-1 or CW-2 was in a position to call him or make controlled purchases from him. The affidavits also stated that, while CW-3 was in a better position to deal with Gee, he had only recently been developed as a confidential witness and had only been able to make two separate, controlled purchases of large quantities of cocaine from Gee: one in the amount of 100 grams and the other in the amount of 125 grams. The government also reported in the November 15th affidavit that it had just learned that Gee had stopped using Target Telephone 3 shortly after the wiretap had been initiated and that Gee had not given CW-3 his new cell number. As a result, CW-3 had been unable to contact Gee from October 26 through November 4, 2010. When CW-3 was able to track Gee down and re-establish contact with him, he was able to get his new cell phone number and thereby enable the government to apply for a wiretap order for that cell phone, Target Telephone 4. CW-3 also learned that Gee had been "laying low" because recent violent events had caused him to worry about his safety. The affidavits advised that shortly after CW-3 re-established contact with Gee, he was able to make three more controlled purchases of large quantities of cocaine from him.

The affidavits also outlined how other investigative methods, such as the grand jury, search warrants and consensual recordings, were not viable because they were unlikely to be effective in obtaining the critical information about the organization and would alert Gee and others to the investigation.

The affidavits concluded that continued physical surveillance and use of CW-3 would enable them to obtain the necessary evidence only if those methods were used in conjunction with electronic surveillance, especially because cell phones were primarily relied on by Gee and others to conduct their drug trafficking activities. Used together, the traditional and enhanced techniques would better enable the agents to identify other individuals involved in the drug conspiracy and their respective roles, as well as the nature, time, location and identity of those who participated in meetings and drug transactions; the places where narcotics were stored and packaged; the means and methods the organization planned to employ in its distribution efforts; and to obtain evidence to corroborate the information received from confidential sources.

Despite the significant amount of detail in the challenged affidavits as to the nature and progress of the investigation and of the success obtained to date and the difficulties encountered in using traditional law enforcement techniques, Gee claimed that the affidavits violated the necessity requirements of Section 2518(3)(c). More particularly, he asserted that the affidavits did not provide a "full and complete statement" as to whether or not other investigative procedures had been tried and failed or why they reasonably appeared unlikely to succeed if tried or how they would be too dangerous. See 18 U.S.C. § 2518(3)(c). According to Gee, the government wiretapped his cell phones because it "wanted to, not because it had to" in order to "fast track its investigation" and "in pursuit of expediency rather than necessity," while disregarding and eschewing less invasive, traditional investigative procedures that remained

8

promising and available to expose the crimes under investigation.[3]  There is no merit to Gee's assertions.

Viewing the challenged affidavits in a commonsense and realistic fashion, and with the deference properly accorded to the issuing judge, United States v. Ruggiero, 726 F.2d 913, 924 (2d Cir. 1984), the Court concludes that the affidavits were far more than "minimally adequate" to support the wiretap orders.  That is, the affidavits disclosed and informed Judge Hall of the nature and progress of the investigation and the difficulties the agents had encountered, and would continue to encounter, through only normal investigative techniques.  The affidavits provided detailed explanations why normal techniques, such as controlled purchases, physical surveillance and confidential witness, had not enabled them to penetrate the upper echelons of the MVB organization or sufficiently identify Gee's major source(s) of supply, the location(s) where drug supplies were stored, the methods the sources used to transport and re-distribute the narcotics and the assets Gee and others had obtained with the proceeds of the drug trafficking.

Contrary to Gee's arguments, merely because, as the affidavits disclosed, the government had already, through traditional methods, been able to infiltrate the organization to some degree and obtain "hard evidence" -- including seven controlled purchases from Gee and others, some of

---

[3]Gee maintains that the supporting affidavits contained generalized, conclusive and false boilerplate statements as to why the continued use of traditional investigative procedures alone would prove unsuccessful even though the facts demonstrated that those procedures had been very successful and had enabled the government to build a powerful case against him and the other members of the MVB organization.  This contention is not only lacking in factual support, its conclusory nature renders it a totally inadequate challenge to the veracity of the affidavits. See Franks v. Delaware, 438 U.S. 154, 171-72 (1978) (holding that a challenge to the truth of an affidavit must be more than conclusory – it must contain allegations of deliberate falsehoods or reckless disregard for the truth and be accompanied by an offer of proof); see also United States v. Bianco, 998 F.2d at 1125; Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991).

the places where Gee and others conducted business and socialized and "solid leads" as to the identity of Gee's sources of supply – does not negate a finding that electronic surveillance was necessary for the government to successfully achieve the objectives of the investigation and obtain all the evidence needed to convict Gee and the other members of the large and dangerous drug conspiracy.

The law is clear that the government is not required to exhaust all traditional methods of investigation, even those that had proved fruitful, before resorting to electronic surveillance. E.g., United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997). The challenged affidavits contained a reasoned and detailed explanation of the nature and progress of the investigation and the difficulties encountered in the use of traditional investigative methods which was all that was needed to convince Judge Hall that the progress the government had made had not exposed the entirety of the drug conspiracy and that the use of electronic surveillance, in conjunction with the traditional methods that had produced results, was needed to uncover critical evidence for a successful prosecution and to fill-in the missing, yet essential, details regarding the organization's sources of supply, the entirety of its membership, the roles each member played and its finances. Nothing more is required by 18 U.S.C. § 2518(3)(c).

*Conclusion*

For the foregoing reasons, the Court DENIED Gee's motion to suppress the communications that were intercepted over his two cellular phones [doc. # 390].

SO ORDERED.

/s/_____
Ellen Bree Burns
Senior United States District Judge

Dated this 12th day of June, 2013, at New Haven, Connecticut.